HASTINGS W. BAKER AND BEVERLY J. BAKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baker v. Commissioner
Docket No. 17167-93.
United States Tax Court
T.C. Memo 1995-385; 1995 Tax Ct. Memo LEXIS 383; 70 T.C.M. (CCH) 387; August 14, 1995, Filed *383 Decision will be entered under Rule 155. James H. Stethem, for petitioners. Jeffrey L. Bassin, for respondent. JACOBS, Judge JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes in the amounts of $ 32,389 for 1990 and $ 15,484 for 1991, and accuracy-related penalties for negligence pursuant to section 6662 in the amounts of $ 6,478 for 1990 and $ 3,097 for 1991. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by the parties, the principal issue for decision concerns the characterization of advances (business vs. nonbusiness) made by Hastings W. Baker to or on behalf of Classical Music Syndication, Inc. We must also determine whether petitioners are liable for accuracy-related penalties for negligence pursuant to section 6662. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Hastings W. and Beverly J. Baker [1] resided *384 in Norwalk, Connecticut, at the time they filed their petition. Petitioner is a graduate of Fordham Law School. During the course of his career, petitioner practiced law with a New York City law firm and held various legal and executive positions with American corporations. These positions included serving as head of the legal department, officer, and director of several publicly traded companies. Petitioner subsequently became a business consultant. As a business consultant, he was retained by companies to negotiate mergers and acquisitions. During this time, petitioner became involved with Primus, Inc. (Primus), a privately held corporation that established a large chain of plumbing supply companies. Petitioner was one of Primus' original investors and was a member of its board of directors. *385 At a point in time not disclosed in the record, Primus' board of directors requested petitioner to negotiate an agreement to merge Primus into Care Centers, Inc. (Care Centers), a publicly traded operator of nursing homes. The reason for the proposed merger was to enable Primus to be converted from a privately traded company to a publicly traded one. Although Primus' shareholders ultimately rejected such a merger, Care Centers' board of directors was sufficiently impressed with petitioner that it invited him to serve as president of Care Centers. Petitioner accepted this invitation. At the time of petitioner's acceptance, Care Centers was basically worthless. Petitioner acquired 25 to 30 percent of the stock of Care Centers, turned the company around, and eventually sold it for approximately $ 6 million. During petitioner's involvement with Care Centers, he made several loans to the company in order to help it meet cash-flow emergencies. All of these loans were repaid. At the same time that petitioner served as president of Care Centers, he also served as managing director of an association that represented broadcasting companies. Through his contacts in this capacity, petitioner *386 learned of an opportunity to acquire the license of an AM radio station in Portland, Oregon (AM radio station) that was going to be reassigned by the Federal Communications Commission (FCC). At the time its license had been canceled, the AM radio station was the number one radio station in its market. Petitioner believed this to be a great opportunity, and applied to the FCC for the license. The FCC informed petitioner that he was one of three finalists for the license. Petitioner then assigned to Care Centers his rights as an applicant. In exchange, Care Centers reimbursed petitioner for the expenses he incurred in acquiring these rights. Ultimately, the three finalists for the license jointly acquired the AM radio station. The three finalists organized a corporation, Fort Vancouver Broadcasting Company (Fort Vancouver), to own and operate the AM radio station. Care Centers received approximately one-third of Fort Vancouver's stock. Over time, Care Centers became the majority shareholder of Fort Vancouver. Care Centers held its Fort Vancouver stock through a subsidiary, Longwood Broadcasting. At no time did petitioner individually own any stock of Fort Vancouver; he did, however, *387 own 25 to 30 percent of the stock of Care Centers. Petitioner made a series of loans, totaling approximately $ 1.5 million, to Fort Vancouver through Longwood Broadcasting. In exchange for his loans, petitioner received convertible debentures of Longwood Broadcasting. Other individuals also lent funds to Fort Vancouver, although these individuals lent far smaller amounts than did petitioner. These individuals were principally friends and relatives of William Failing (Failing), who was the manager of the AM radio station. Petitioner also guaranteed a $ 6 million loan to Fort Vancouver from the Bank of New England that was made in order for Fort Vancouver to acquire an FM radio station. However, the process took so long that by the time Fort Vancouver acquired the FM radio station, employee morale at the station had plummeted, and the station had declined substantially in value. Fort Vancouver was consequently forced into bankruptcy and had to sell the FM radio station. As a result of the bankruptcy, petitioner lost the money that he had lent to Longwood Broadcasting, and any possibility of recovering the funds through Fort Vancouver. Petitioner did, however, persuade the Bank of *388 New England to release him from his loan guarantee. Fort Vancouver had attempted to increase its revenues by switching the format of the AM radio station to classical music. The AM radio station "became at one time the highest rated commercial classical format station in the country." After Fort Vancouver failed, petitioner developed the idea of attempting to market classical music programs to radio stations across the country. Petitioner felt this offered great commercial potential "because of the success of the format and the quality of the music." The plan developed by petitioner entailed the following: Failing would market, and obtain customers for, the classical music programs through a company that Failing would own; while petitioner would provide the money to fund the company. If the company was successful, the first profits would go proportionately to those who had previously lent and lost money to Fort Vancouver. Once everyone who had lent and lost money to Fort Vancouver had been fully repaid, Failing would be entitled to the rest of the company's profits. Because petitioner had lent and lost more money than anyone else, petitioner's plan would result in his receiving the *389 majority of the venture's first profits. Failing was receptive to petitioner's plan. Thus, on April 2, 1986, Classical Music Syndication, Inc. (Classical) was incorporated under the laws of Delaware. Failing was sole shareholder of Classical, and served as its president. Petitioner and Failing served on Classical's initial board of directors. Petitioner provided the financial backing for Classical in the form of checks and wire transfers. He made advances to or on behalf of Classical during 1988 totaling $ 60,198 as follows: Citytrust--Checks
Date
Check Number
Amount
Payee
01/29/88
1524
$ 800
William Failing
02/26/88
1556
114
William Failing
04/09/88
1583
114
William Failing
04/22/88
1587
175
William Failing
05/03/88
1592
429
William Failing
06/13/88
1172
69
William Failing
06/15/88
1173
480
William Failing
06/15/88
1586
500
William Failing
07/01/88
1174
1,000
William Failing
07/26/88
1195
182
William Failing
07/29/88
1197
3,000
Classical Music
Syndication, Inc.
08/17/88
1210
6,300
Bonneville Broadcasting
08/22/88
1179
2,000
William Failing
08/31/88
1217
1,000
William Failing
09/02/88
1220
400
William Failing
09/22/88
1224
750
Classical Music
Syndication, Inc.
09/23/88
1223
4,000
Classical Music
Syndication, Inc.
10/17/88
1246
9,000
Classical Music
Syndication, Inc.
10/19/88
1250
1,000
Classical Music
Syndication, Inc.
10/20/88
1257
585
CT Corp System
10/30/88
1262
1,500
Classical Music
Syndication, Inc.
11/16/88
1267
1,100
Classical Music
Syndication, Inc.
12/05/88
1295
3,500
Classical Music
Syndication, Inc.
12/16/88
1299
500
Classical Music
Syndication, Inc.
12/29/88
1312
2,000
Classical Music
Syndication, Inc.
Total
40,498
Bank One, Dayton, NA--Checks
Date
Check Number
Amount
Payee
08/13/88
1044
$ 2,000
William Failing
Citytrust--Wire Transfers
Date  Number
Amount
Payee
08/05/88
170047
$ 4,000
William Failing
08/09/88
170300
7,000
William Failing
09/16/88
175945
2,200
Classical Music
Syndication, Inc.
10/12/88
179252
1,500
Bonneville Broadcasting
11/14/88
181495
2,500
Classical Music
Syndication, Inc.
11/22/88
182462
500
Classical Music
Syndication, Inc.
Total
17,700
*390 Petitioner made advances to or on behalf of Classical during 1989 totaling $ 80,318 as follows: Citytrust--Checks
Date
Check Number
Amount
Payee
01/20/89
1320
$ 1,600
Classical Music
Syndication, Inc.
02/03/89
1343
12,000
Classical Music
Syndication, Inc.
02/06/89
1355
1,000
Classical Music
Syndication, Inc.
03/10/89
1374
4,500
Classical Music
Syndication, Inc.
04/01/89
1390
1,200
Classical Music
Syndication, Inc.
04/12/89
1397
1,000
Classical Music
Syndication, Inc.
04/14/89
1400
2,000
Lawrence Holmes
05/08/89
1420
700
Classical Music
Syndication, Inc.
05/20/89
1423
1,000
Classical Music
Syndication, Inc.
05/30/89
1433
700
Classical Music
Syndication, Inc.
06/01/89
1435
3,000
William Failing
06/06/89
1445
850
Bowler Associates
06/07/89
1449
1,000
Lawrence Holmes
06/16/89
1605
2,500
William Failing
06/18/89
1608
2,000
Classical Music
Syndication, Inc.
06/20/89
1614
300
Classical Music
Syndication, Inc.
06/30/89
1627
3,000
William Failing
07/08/89
1630
530
Classical Music
Syndication, Inc.
07/14/89
1637
300
Classical Music
Syndication, Inc.
07/25/89
1643
5,724
American Express
07/27/89
1647
300
Classical Music
Syndication, Inc.
08/02/89
1658
2,000
Bonneville Broadcasting
08/03/89
1657
3,000
William Failing
08/04/89
1659
914
William Failing
08/07/89
1673
1,000
Classical Music
Syndication, Inc.
09/05/89
1682
1,200
Classical Music
Syndication, Inc.
09/12/89
1684
2,000
Classical Music
Syndication, Inc.
09/15/89
1688
5,000
Classical Music
Syndication, Inc.
09/26/89
1694
3,500
Classical Music
Syndication, Inc.
Total
63,818
Union Trust Account--Checks
Date
Amount
Payee
12/13/89
$ 10,000
Classical Music
Syndication, Inc.
Citytrust--Wire Transfers
Date
Number
Amount
Payee
03/20/89
193599
$ 2,000
Classical Music
Syndication, Inc.
04/24/89
195882
1,500
Classical Music
Syndication, Inc.
05/02/89
196504
2,000
Classical Music
Syndication, Inc.
05/15/89
197653
1,000
Classical Music
Syndication, Inc.
Total
6,500
*391 Petitioner made advances to or on behalf of Classical during 1990 totaling $ 13,000 as follows: Union Trust Account--Checks
Date
Amount
Payee
01/24/90
$ 10,000
Classical Music
Syndication, Inc.
02/27/90
3,000
Classical Music
Syndication, Inc.
Total
13,000
Petitioner's advances to or on behalf of Classical totaled $ 153,516. Neither Classical nor Failing entered into a written loan agreement with petitioner, or executed any notes confirming an obligation to repay petitioner the amounts that petitioner advanced. Petitioner's arrangement with Classical and Failing did not provide for a fixed repayment schedule or a maturity date. At the time petitioner advanced the funds, he knew that if Classical did not make a profit, he would not recover his advances. Petitioner was not entitled to, and did not receive, any salary, commissions, or fees from Classical. By the middle of 1988, petitioner's chances of recovering funds from Classical were lower than at the outset of the venture. Nonetheless, he continued advancing funds to or on behalf of Classical until early 1990. Although Classical ultimately sold its programs to a few stations and had some receipts, *392 Classical was not successful and did not realize any profits. Petitioner never received repayment of any funds that he had advanced to or on behalf of Classical, nor did he receive repayment of any funds that he had previously lent to Fort Vancouver. He never made a demand for repayment of these funds, nor did he take any action against either Classical or Failing to recover them. Petitioner considered himself to be in the trade or business of lending money, and over the years he had considered several other loan proposals. He evaluated other loan proposals, and in some cases he would make the loans, and in others he would not. Petitioner did not advertise or otherwise hold himself out to the public as being in the business of making loans. He did not actively solicit business to make loans. Petitioner did not keep any specific records, such as journals or ledgers, concerning loans that he made. Rather, he relied on canceled checks for record keeping. Petitioner prepared petitioners' 1990 and 1991 joint Federal income tax returns. On petitioners' 1990 Federal income tax return, petitioner's occupation was listed as "retired investor". On petitioner's 1991 Federal income tax return, *393 petitioner's occupation was left blank. Petitioners claimed a $ 100,000 deduction for bad debt expense on Schedule C of their 1990 Federal income tax return, and a $ 53,000 deduction for bad debt expense on Schedule C of their 1991 Federal income tax return, both of which respondent disallowed. OPINION Issue 1. Characterization of Advances
A. Preliminary Matter
The notices of deficiencies, as well as the pleadings, treated petitioner's advances to or on behalf of Classical as loans. The parties' dispute, as so framed, concerned the classification of the advances--that is, whether the loans were business loans, as petitioners contended, or nonbusiness loans, as respondent contended. In this regard, in the notice of deficiency relating to 1990, respondent determined that petitioners were not entitled to the claimed business bad debt deduction of $ 100,000, but instead were entitled to a nonbusiness bad debt deduction of $ 3,000 as a short-term capital loss. For 1991, respondent determined that petitioners were not entitled to a bad debt deduction of $ 53,000 because the bad debt was not verified. Ultimately, the parties stipulated that petitioner's advances to or on behalf *394 of Classical totaled $ 153,516. At trial, during opening statement, respondent's counsel questioned for the first time "whether there was a bona fide debt at all". Petitioners' counsel claimed surprise and stated that because respondent's new position was never a point of contention, petitioners would be prejudiced if such a position were allowed to be considered. We agree that petitioners were not given adequate notice of respondent's last-minute assertion that petitioner's advances were not loans. Accordingly, we will disregard respondent's attempt to raise and argue this new theory. See Rule 31(a); Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973); Carraway v. Commissioner, T.C. Memo. 1994-295. We shall therefore treat the advances made by petitioner to or on behalf of Classical as loans. B. Business or Nonbusiness Loans
We now turn to the classification of petitioner's loans to Classical; that is, whether the loans were business or nonbusiness. Petitioners claim that petitioner's loans to Classical should be classified as business loans, and that his losses with respect to said loans should be classified *395 as losses from business bad debts. Respondent, on the other hand, contends petitioner's loans should be classified as nonbusiness loans, so that his losses with respect to said loans are from nonbusiness bad debts. The reason for the difference in classification is that losses from nonbusiness bad debts are subject to certain limitations imposed by section 166(d)(1), whereas losses from business bad debts are not. Section 166(a) permits a deduction for any debt that becomes worthless within the taxable year. Section 166(d)(1) restricts the deduction for losses from nonbusiness debts of a taxpayer other than a corporation by characterizing them as short-term capital losses. Section 1211(b) restricts the deduction for capital losses of a taxpayer other than a corporation to the extent of capital gains plus (if such losses exceed such gains) the lesser of $ 3,000 or the excess of such losses over such gains. Section 1212(b) permits a taxpayer other than a corporation a carry over of any capital loss in excess of this amount to the succeeding taxable year. A nonbusiness debt is "a debt other than--(A) a debt created or acquired * * * in connection with a trade or business of the taxpayer; *396 or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2). The question of whether a debt is a business debt or a nonbusiness debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs. A debt must be proximately related to the taxpayer's conduct of a trade or business in order to constitute a business debt. Id.; United States v. Generes, 405 U.S. 93 (1972). Whether the taxpayer is engaged in a trade or business is a question of fact. United States v. Generes, supra at 104; Dorminey v. Commissioner, 26 T.C. 940, 945 (1956). Generally, a trade or business is an activity that is "pursued full time, in good faith, and with regularity", and for the production of income. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Whether a debt bears a proximate relation to that trade or business is determined based on the dominant motivation of the taxpayer in incurring the debt. United States v. Generes, supra at 103. A significant motivation is not sufficient. *397 Id.
In relation to activities involving the lending of money, we have held that the "right to deduct bad debts as business losses is applicable only to the exceptional situations in which the taxpayer's activities in making loans have been regarded as so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner, 61 T.C. 318, 323 (1973). The taxpayer must establish that he was in the trade or business of lending money during the years when he made the loans that subsequently became uncollectible; in addition, the taxpayer must show that the loans in question were proximately related to the business of lending money. United States v. Generes, supra.
Factors which have been considered in determining whether a taxpayer is engaged in the trade or business of lending money include: The number of loans made by the taxpayer; the time period over which such loans were made; the adequacy and nature of the taxpayer's records; the amount of time devoted to the lending activity; whether the taxpayer actively sought out lending business; whether the taxpayer advertised or *398 maintained a separate office for the business; the maintenance of separate books and accounts for the business, or profit and loss statements; the taxpayer's general reputation in the community as a lender; and the relationship of the debtors to the taxpayer-lender. United States v. Henderson, 375 F.2d 36, 41 (5th Cir. 1967). Petitioners allege that petitioner was in the trade or business of lending money and that his bad debt losses were incurred in connection with such business. As such, petitioners argue the losses are deductible against ordinary income under section 166(a)(1). Respondent contends that petitioner was not in the separate trade or business of lending money, or, alternatively, that assuming arguendo petitioner is considered to be in the general trade or business of lending money, his specific involvement in Classical was merely an investment and not connected to his general trade or business of lending money. Under either approach, respondent concludes that petitioner's losses were nonbusiness bad debt losses, which are deductible only as short-term capital losses under section 166(d)(1). We agree with respondent's contention that *399 petitioner was not in the trade or business of lending money. Petitioner made no more than a small number of loans over a period of several years. Except for the canceled checks and wire transfers that he received from the banks, petitioner kept no books and records of his lending activities. He did not spend any time soliciting lending business, nor did he advertise that he was in the trade or business of lending money. He did not maintain a separate office for the business of lending money. Further, he did not present any evidence regarding his relationships with his debtors. Consequently, we conclude that petitioner's lending activity, at best, was sporadic and was not so extensive and continuous as to elevate his lending to the status of a separate trade or business. Accordingly, we hold that petitioner's loans to Classical were nonbusiness loans. Issue 2. Accuracy-Related Penalties
Respondent determined that petitioners are liable for accuracy-related penalties for negligence under section 6662. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *400 Petitioners failed to introduce any evidence that they maintained records to substantiate their claim that the bad debts deducted in 1990 and 1991 arose in any trade or business conducted by petitioner. Petitioner was careless in preparing petitioners' 1990 and 1991 returns. Petitioners deducted $ 100,000 as a business bad debt in 1990 because that was the amount needed to zero out their tax liabilities for the year. Petitioners were also careless in the handling of another item (residential mortgage interest) that was settled by the parties. They reported the mortgage interest on Schedule C as business interest, rather than on Schedule A. Petitioners have the burden of proving that they were not negligent. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989). Petitioners failed to demonstrate that they were not negligent. Indeed, the record clearly indicates that they were negligent. Accordingly, we sustain respondent's determination with respect to the accuracy-related penalties for negligence under section 6662. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Beverly J. Baker is involved in this case by virtue of having filed joint Federal income tax returns with her husband, Hastings W. Baker, for both years in issue. Hastings W. Baker will hereafter be referred to as petitioner.↩